Madison Silo Company v. Commissioner.
Madison Silo Co. v. Commissioner
Docket No. 21480.
United States Tax Court
1952 Tax Ct. Memo LEXIS 338; 11 T.C.M. (CCH) 82; T.C.M. (RIA) 52054; January 29, 1952
*338 Upon the record, it is found that the salaries paid by petitioner to its four executive officers during the taxable years here involved constituted reasonable compensation for services rendered. Harold R. Burnstein, John E. Hughes, Esq., and John W. Hughes, Esq., 105 W. Adams St., Chicago 3, Ill., for the petitioner, David F. Long, Esq., for the respondent. LEECH Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined deficiencies in income tax of $39,865.96 and $36,936 for the taxable years 1946 and 1947, respectively, declared value excess-profits tax in the amounts of $5,769.12 and $5,817.79 for the taxable years 1944 and 1945, respectively, and excess-profits tax in the amounts of $36,237.03 and $45,385.19 for the taxable years 1944 and 1945, respectively. The only issue for decision is the reasonableness, as compensation for services rendered, of the amounts paid by petitioner to its four executive officers in the taxable years 1944 to 1947, inclusive. Two other issues raised by the petition have been settled by stipulation of the parties. Some of the facts are stipulated and are so found. Findings of Fact The petitioner *339 is a Wisconsin corporation organized in 1921, as successor to a partnership formed in 1914. Since its incorporation it has engaged in the manufacture, sale and erection of cement stave silos. Its returns for the periods here involved were filed with the collector of internal revenue for the district of Wisconsin. Petitioner's four executives during the taxable years were C. C. Woody, Ben F. Gurney, W. W. Gurney and M. N. Hein. Woody had been associated with the petitioner for 34 years, and the other three individuals for 29 years. C. C. Woody was president and in charge of purchasing; Ben F. Gurney was secretary-treasurer and manager of the Madison division, W. W. Gurney was vice-president, manager of the accessories department and manager of the Winona division; and M. N. Hein was vice-president, advertising manager, chairman of the board of directors and manager of the Chippewa Falls division. The conduct of petitioner's business demanded skill and specialized knowledge which was possessed by each of petitioner's above-named officers. These officers were the only executives of the business and had no executive assistants. Upon its incorporation in 1921, the petitioner adopted *340 a policy of paying its executive officers nominal salaries of $1,200 per year with additional compensation amounting to approximately 80 per cent of petitioner's earnings for the year. In 1935 the amount of the fixed salaries was increased from $1,200 to $1,800 per year and has remained at this figure since that time, including the taxable years here in question. In some of the prior years the basis upon which the executive salaries were paid resulted in the officers of petitioner receiving only a small return in addition to the fixed salaries of $1,800 per year, a total compensation manifestly less than the value of the services rendered. Prior to 1944 there were five executive officers of the petitioner, but at the begining of that year J. Ray Trusler, who had been president of petitioner since its organization, retired, and his stockholdings in the petitioner corporation were acquired by the four remaining executives. From 1932 to 1943, inclusive, 30 shares of petitioner's common stock, out of a total of 1,043 shares, were owned by miscellaneous employees of petitioner not related to its officers. The remaining outstanding common stock of petitioner was owned by the five then *341 executive officers, but not in the same proportion, J. Ray Trusler owning 375 shares, C. C. Woody 378 shares, W. W. Gurney 90 shares, Ben F. Gurney 90 shares, and M. N. Hein 80 shares. Upon the acquisition, at the beginning of 1944, of the stock of J. Ray Trusler by the remaining four officers of petitioner, they were the owners of all of the common stock outstanding. During the year 1944 C. C. Woody was the owner of 410 shares, and the other three officers owned 241 shares each. During the calendar years 1945 and 1946, 440 shares of the common stock were owned by C. C. Woody, and the other three officers each owned 270 shares. During the calendar year 1947 the ownership of the common stock was: C. C. Woody, 438 shares, the three other officers, 270 shares each, and N. D. Woody, son of C. C. Woody, 2 shares. Total sales and gross profit from sales of petitioner for the calendar years 1921 to 1947, inclusive, were: Gross Profit
Year
Total Sales
from Sales
1921
$145,729.24
$ 83,222.15
1922
191,233.20
108,095.25
1923
310,237.49
174,514.30
1924
358,885.77
200,277.86
1925
321,467.34
178,251.84
1926
418,898.04
227,103.13
1927
478,316.60
277,929.34
1928
488,534.89
279,428.07
1929
487,326.24
282,142.25
1930
434,272.79
257,290.53
1931
213,473.29
118,451.86
1932
115,135.93
65,298.75
1933
128,715.07
67,142.83
1934
295,087.85
166,526.39
1935
295,463.63
152,146.90
1936
359,441.32
236,638.39
1937
483,644.90
323,842.18
1938
426,492.78
179,003.80
1939
$ 349,956.80
$131,594.52
1940
467,520.87
190,527.04
1941
658,707.12
212,592.94
1942
577,581.41
209,065.75
1943
526,735.37
179,627.25
1944
646,499.55
221,049.12
1945
733,516.42
247,686.56
1946
1,002,135.24
363,476.48
1947
1,366,482.40
490,048.87
*342 At the close of 1943, upon the retirement of J. Ray Trusler as an executive officer of petitioner, the services formerly performed by him were taken over and performed by the remaining four executive officers. On January 19, 1944 the board of directors of petitioner authorized by resolution the payment of salaries to the four officers hereinbefore mentioned of $150 per month each, plus 20 per cent to each of the gross profit of petitioner for the year, such gross profit to be computed by deduction of all expenses, charges and deductions, including depreciation and the $150 fixed monthly salaries. In 1947 the provision for payment of additional salaries to petitioner's four officers was amended to restrict to an amount not in excess of $40,000 per year the amount of additional compensation paid to each officer. Under contract entered into December 20, 1944 by petitioner, one Julius Johnson was employed as joint manager in charge of sales, construction and collection of accounts at one of petitioner's plants. Johnson owned no stock in petitioner and was not related to any officer of petitioner. Under the contract he was to receive one-third of the profits from the operation of the *343 plant. Under this contract Johnson received in the following year a total salary of $45,112.25. This contract was subject to cancellation upon six months' notice by petitioner, but at the time of the hearing of this proceeding had not been cancelled. The salaries and additional compensation paid by petitioner to its former president, J. Ray Trusler, and its four executive officers, whose salaries are here in question, were for years and in amounts as follows: J. Ray Trusler
C. C. Woody
W. W. Gurney
Additional
Additional
Additional
Year
Salary
Compensation
Salary
Compensation
Salary
Compensation
1921
$1200
$ 6,637.69
$1200
$ 6,637.69
$1200
$ 710.35
1922
1200
9,374.67
1200
9,374.67
1200
1,236.93
1923
1200
11,439.36
1200
11,439.36
1200
6,271.85
1924
1200
10,885.56
1200
10,885.56
1200
7,025.20
1925
1200
6,795.05
1200
6,795.05
1200
3,656.90
1926
1200
9,900.00
1200
9,900.00
1200
5,846.40
1927
1200
19,741.37
1200
19,741.37
1200
8,142.02
1928
1200
20,704.70
1200
20,704.70
1275
7,742.08
1929
1200
11,156.56
1200
11,156.56
1800
5,116.71
1930
1200
9,400.00
1200
9,400.00
1800
4,137.60
1931
322
0
322
0
1800
869.18
1932
1200
(677.40)
1200
(677.40)
1625
(668.17)
1933
1200
394.76
1200
394.76
1380
140.34
1934
1450
11,002.49
1450
11,002.49
1555
5,001.09
1935
1800
3,973.15
1800
3,973.15
1800
3,747.10
1936
1800
10,662.40
1800
10,662.40
1800
4,221.60
1937
1800
16,665.98
1800
16,665.98
1800
5,035.60
1938
1800
12,315.70
1800
12,315.70
1800
4,696.90
1939
1800
4,108.36
1800
4,108.36
1800
1,652.00
1940
1800
7,592.53
1800
7,592.53
1800
6,190.68
1941
1800
19,742.24
1800
19,742.24
1800
7,013.55
1942
1800
23,644.07
1800
23,644.07
1800
8,910.56
1943
1800
20,634.30
1800
18,684.30
1800
9,126.37
1944
1800
24,952.10
1800
25,027.10
1945
1800
28,000.00
1800
28,000.00
1946
1800
41,651.00
1800
41,651.00
1947
1800
40,000.00
1800
40,000.00
*344 B. F. Gurney
M. N. Hein
Additional
Additional
Year
Salary
Compensation
Salary
Compensation
1921
$1200
$ 710.35
$1200
1922
1200
1,236.93
1200
$ 2,304.86
1923
1200
6,271.85
1200
3,707.14
1924
1200
7025.20
1200
10,304.83
1925
1200
3,656.90
1200
7,226.54
1926
1200
5,846.40
1200
10,552.33
1927
1200
8,142.02
1200
12,067.27
1928
1275
7,742.08
1275
8,590.55
1929
1800
5,116.71
1800
9,223.43
1930
1800
4,137.60
1800
6,737.40
1931
1800
869.18
1800
2,248.84
1932
1625
(668.17)
1933
1380
140.34
1380
(585.38)
1934
1555
5,001.09
1555
6,406.05
1935
1800
3,747.10
1800
1,421.99
1936
1800
4,221.60
1800
1,987.20
1937
1800
5,035.60
1800
4,527.08
1938
1800
4,696.90
1800
2,476.54
1939
1800
1,652.00
1800
1,295.22
1940
1800
6,190.68
1800
3,317.28
1941
1800
7,013.55
1800
3,940.62
1942
1800
8,910.56
1800
13,647.90
1943
1800
9,126.37
1800
12.626.16
1944
1800
25,027.10
1800
25,027.10
1945
1800
28,000.00
1800
28,000.00
1946
1800
41,651.00
1800
41,651.00
1947
1800
40,000.00
1800
40,000.00
Petitioner's officers have developed the business *345 of petitioner from a small beginning to a prosperous business of large production and substantial profits. They have made inventions of devices used to great advantage by petitioner in the carrying on of its business. Patents were issued upon these inventions. These patents were conveyed to petitioner without cost. In addition to the manufacturing of concrete staves and the building of silos, they have established and organized an accessories division for the manufacture of various accessories used by petitioner in its construction of the completed silos. This has enabled petitioner to manufacture accessories at approximately 50 per cent of what their cost would otherwise have been. During the four years here in question, the cost to petitioner for manufacturing these accessories was $335,816.87, representing a saving to petitioner over that period of approximately the same amount. Petitioner employs salesmen on a commission of 10 per cent to negotiate sales of silos to farmers in its territory. Petitioner's executives, however, personally make many sales of silos upon which no commission is paid by petitioner. The silos thus sold by petitioner's officers during the taxable years *346 here in question resulted in a saving to petitioner in unpaid commissions of $34,786.28 in 1944, $42,447.31 in 1945, $54,752.05 in 1946 and $67,532.48 in 1947. Petitioner has paid a dividend in every year since 1932, except for 1939 an 1940. In the four taxable years here in question, the dividend paid amounted to 24 per cent on the common stock. During these four years petitioner's surplus increased from $78,794.24 at the close of 1943 to $189,066.97 at the close of 1947. Petitioner is recognized in its territory as the outstanding manufacturer of concrete silos. In determining the contested deficiencies respondent has reduced petitioner's deductions for compensation paid its four officers by the amounts of $47,233.40, $54,200, $103,804 and $97,200, for the years 1944, 1945, 1946 and 1947, respectively. He has determined that the sums of $60,000 for the year 1944, $65,000 for the year 1945 and $70,000 for each of the years 1946 and 1947 are reasonable total compensation for services rendered by the four officers of petitioner. The salaries paid by petitioner to its four officers during the taxable years here in question were reasonable compensation for services actually rendered. *347 Opinion The issue is the reasonableness of the salaries paid by petitioner to its four officers in the taxable years 1944 to 1947, inclusive. By his disallowance of the major portion of the total paid as salaries in those years, respondent has not attempted to determine a reasonable salary for each individual. His determination is merely in a gross amount which he determined was the maximum amount which petitioner was justified in paying in executive salaries in each of the four years. Since the four officers in question received, under the contract with petitioner, the same salary, it appears reasonable to allocate the amount allowed by respondent upon an equal basis. This allocation results in a salary of $15,000 for each for 1944, $16,250 each for 1945, and $17,500 each for the years 1946 and 1947. These salaries, it is noted, are less than the amounts received by petitioner's former president, J. Ray Trusler, and its present president, C. C. Woody, in certain years prior to the four years in question and during the time petitioner's gross sales and net income were far below the figures during the four taxable years here. It does not appear that the reasonableness of the salaries *348 paid in the past by petitioner to its executives has been questioned. Respondent contends that petitioner's four executives, being the owners of all of petitioner's common stock and thus in a position to absolutely control the amount which petitioner might disburse from its earnings in salaries and dividends, have used such power to drain off petitioner's income in payments of executive salaries to its officers, which represented in fact distributions of earnings to them as stockholders. We agree that salaries paid executive officers under a contract between them and a corporation in which they owned all the voting stock are subject to very close scrutiny to determine whether the alleged salary payments actually were salaries which were justified and so deductible expenses, or whether the arrangement was merely a subterfuge by which distributions of earnings were made to stockholders. In support of his contention the respondent argues that the operation of petitioner's business did not require any high degree of skill or knowledge. It is insisted that the manufacturing operations of petitioner were of the simplest character. We do not agree. The record shows that the business *349 of manufacturing and erecting concrete silos in the territory served by the petitioner is highly competitive. We think it is impossible that the officers of petitioner could have brought it from a small beginning to its present place as the leading manufacturer of such silos in this territory without an exceedingly high degree of knowledge of the technical side of the business, and unusual executive ability in management. Such ability and success are entitled to recognition in payment for the services. There are several factors which, we think, indicate that the arrangement made, under which additional compensation to petitioner's officers was based on profits, was not a scheme for tax purposes. In the first place, it must be borne in mind that the arrangement under which these salaries were paid had been in effect practically since the organization of the petitioner corporation in 1921. In the early years the fixed compensation received by these officers was at a rate of $1,200 per year. This was increased in 1935 to $1,800 per year. The additional compensation based upon the yearly earnings can be seen under the facts set out in our findings, and has resulted in what was manifestly *350 inadequate compensation during the lean years. However, this arrangement preserved to the petitioner some part of its earnings, whereas, if adequate salaries had been fixed, this might not have been true. It is also noted that the salary received by each of these officers was less than that paid to an employee in 1945 under a salary arrangement similar to that here involved, where such employee was not a stockholder of the petitioner and the contract was at arm's length. It is difficult to conclude that these payments were distributions of dividends in the form of salaries when we note that the stockholdings of C. C. Woody were far greater than those of any of the other three executives, although the salaries paid to each under the arrangement were the same. It must be kept in mind that the formula under which these salaries were computed and paid was adopted under a fixed policy of petitioner which had been in effect for many years, and that during the lean years it worked unquestionably in the interest of the petitioner and against the personal interest of the individual officer. . It is also noted that in 1947, *351 the last of the years here in question, petitioner's stockholder-officers voluntarily amended the salary contract to limit the additional compensation payable to each officer to $40,000 per year, which was a reduction of the amount paid for the preceding and a very substantial reduction in the amount which would otherwise have been payable under the formula in 1947 had not the contract been modified. It is true that there is a prima facie presumption that the determination by the respondent is correct, but that is a presumption of law without probative force and must disappear in the presence of uncontroverted evidence to the contrary. ; ; . Here the respondent has introduced no testimony upon the question of the reasonableness of the salary for services such as were rendered by the four officers of petitioner. He presents no evidence that officers of other corporations similarly circumstanced and performing duties comparable to those of the officers of petitioner received less compensation. On the *352 other hand, we have the testimony of petitioner's four officers that such compensation was reasonable. This is supported by the testimony of the president of the National Silo Association, himself an executive of two silo manufacturing and construction companies. He testified that the salaries paid petitioner's executives in the taxable years were reasonable. This witness was familar with the organization and business activities of the petitioner, the duties performed by its officers, and the success of the petitioner in its operation under the direction of those officers. This witness testified that the petitioner was the outstanding manufacturer in its field. This evidence is definite in establishing the reasonableness of the questioned salaries. It has not been contradicted. Accordingly, we have found that the salaries paid by petitioner to its four executives during the four taxable years were reasonable compensation for services actually rendered. Effect will be given to the stipulation of the parties upon the other two issues here involved upon recomputation of the deficiency. Decision will be entered under Rule 50.